## CIRCUIT COURT OF THE CITY OF RICHMOND

Ritchie & Dunnavant

    v.

G. A. Wilson and
R. A. Lewis

January, 1856

**By JUDGE JOHN A. MEREDITH**

Dr. P. C. Gooch, several years since, established in the City of Richmond a medical journal under the title of "The Stethoscope, a Monthly Journal of Medicine and the Collateral Sciences." It was sold by him to the Virginia Medical Society, and was conducted by the Society under the editorial management of several gentlemen, among them, Dr. R. A. Lewis, one of the defendants in this cause. The Society having determined to part with the journal, offered it for sale in the month of April last through a committee, one of whom was Dr. Wilson, the other defendant. At this sale, Messrs. Ritchie & Dunnavant became the purchasers, at the price of $1,893.09, and thereby became the proprietors of the journal, acquiring only its subscription list and good will--there being none of those material elements connected with the journal which were necessary to its publication. The journal was continued, with Drs. Wilson and Lewis as editors, at an annual salary, which Messrs. Ritchie & Dunnavant stipulated to pay them. At the time of this purchase, there was published in the City of Richmond another medical journal, of which Drs. James B. McCaw, J. F. Peebles, and G. A. Otis were editors and proprietors, entitled "The Virginia Medical and Surgical Journal." The publication of these two periodicals was

continued under the management of their respective editors and proprietors, until the month of December last, when by an agreement in writing entered into by Messrs. Ritchie & Dunnavant on the one part, and Dr. McCaw on the other, the two journals were united, and a new journal, entitled "The Virginia Medical Journal--The Stethoscope and the Virginia Medical and Surgical Journal combined," was published under their joint auspices with Dr. Otis as co-editor. The first number of this new periodical appeared during the present month. [Jan. 1856].

About the time this arrangement was entered into, Drs. Wilson and Lewis were discharged by Messrs. Ritchie and Dunnavant, and they started a new journal as editors and proprietors, styled "The Monthly Stethoscope and Medical Reporter;" the first number of which likewise made its appearance during the present month. When the last mentioned journal was issued, Messrs. Ritchie and Dunnavant conceived their rights infringed by its publication, exhibited their bill for an injunction, charging the defendants with an usurpation of the title of their journal, "The Stethoscope," and claiming the exclusive use of this title; and further charging that the defendants through the medium of their own journal and by other means, had represented that the plaintiffs had suppressed, discontinued and abandoned their journal, and that their representations were made with a view to draw off the patronage and good will of the plaintiffs' journal and transfer it to that of the defendants'; and praying that the defendants be enjoined from publishing and circulating their journal, or any similar work, &c., &c. When the bill was exhibited to me, I desired it to be filed in court, and a rule made upon the defendants returnable to this day to show cause why the injunction prayed for should not be granted, with liberty to either party, on proper notice, to take testimony. I was induced to adopt this course, and not act on the bill on an *ex parte* application, but to give the parties an opportunity to be heard upon the merits, out of abundant caution, because of the novelty of the questions involved, and their importance to the parties concerned. The defendants have answered, admitting some and denying other allegations of the bill; and the question now is, shall the injunction be awarded?

To decide this question, it will be necessary to consider what principles govern a court of equity in such cases. The jurisdiction of course of equity over literary property is similar to that exercised over patents for inventions; and arises from an anxiety to give effect to the legal right, and restrain by means of the short process of an injunction, any violation which might become an injury irremediable by the slow proceedings of the common law. But if the legal right is disputed, the court does not, except in a strong case, interfere in the first instance by injunction, but puts the party to establish his right at law before it confers the equitable remedy. 2 Eden on Injunctions 330-33. The first question to be determined is, as to the legal right, and if the court doubts about that, it may commit great injustice by interfering until that question has been decided. Unless the case depending upon a legal right be very clear, it is the duty of the court to take care that the right be ascertained before it exercises its jurisdiction by an injunction. Looking to this principle to guide the action of the court, I cannot say there is no doubt as to the plaintiffs' legal title. The circumstance which throws doubt on their title arises from their own act in changing the name of their journal, and the varied form in which the defendants have used it. The title of the periodical which the plaintiffs purchased and first published was "The Stethoscope; A Monthly Journal of Medicine and the Collateral Sciences."

They have united their journal with another; dropped the simple name which characterized it, and are publishing a new one with a new title, the title being "The Virginia Medical Journal; The Stethoscope and Virginia Medical and Surgical Journal combined." It is true the word "Stethoscope" is retained; but it does not seem to give the new, as it did, the old journal, its distinctive appellation, to mark its individuality; but to show the combination which has taken place, and the new journal which has sprung from that combination. In Curtis on Copy Right, p. 297, it is laid down that if a periodical work, that has long worn a particular title, changes it for another, the adoption of the old title by a new periodical, after the lapse of a reasonable time, would ordinarily not be such an interference as the courts of justice should

notice. The authority cited for this principle is a decision by the "Cour Royale," at Paris in 1834, which sanctioned the publication of a journal under the title of "Gazette de Sante," which another journal had previously worn, but which it had for seven months abandoned for the title "Gazette Medicale de Paris." It will be observed that this author states that a reasonable time must elapse, and in the case cited seven months had elapsed since the old name had been abandoned or modified. But in such cases, it is a question of intention, and not of time. Time is but a circumstance to show that intention, and where all the circumstances together clearly show an intention on the part of the plaintiffs to abandon the old title, or so combine with another as to lose its distinctive features, and amount to a new title, they waive their right to this title, and authorize its adoption at once by other persons; at least they throw such a cloud over their legal right to the title as to induce a court to hesitate long before it will exercise its equitable relief.

But have the defendants assumed the title of the plaintiffs' journal so as to impose upon the community and supplant it in the good will of the public. An inspection of the periodicals filed with the bill will show that the title of the plaintiffs' first journal was "The Stethoscope; A Monthly Journal of Medicine and the Collateral Sciences." The title of their new journal is "The Virginia Medical Journal; The Stethoscope and the Virginia Medical and Surgical Journal combined." The title of the defendants' journal is "The Monthly Stethoscope and Medical Reporter."

The names of these three journals are clearly distinguishable, and cannot mislead the intelligent patrons of either. It is true, the word Stethoscope is used in each; but the defendants have accompanied it with other words prefixed and added, which give a distinct appellation to their journal, and are sufficient to apprise all persons that they are really different publications. Their different titles and the different matter which must appear in two monthly journal, seem to afford all the information that can be desired by those who choose to give their patronage to one or the other. Nor can the eye be misled. The color and size of the plaintiffs' journal is unlike that of

the defendants'; and the plaintiffs have embellished their new work with an imposing wood cut of Esculapius, in striking contrast with the more unpretending cover which envelopes the defendants' journal.

The most that can be said on this point is, that the defendants have simulated the plaintiffs' title. But I can find no case in which the mere simulation by one party of another's title has called forth the interference of the courts. A brief examination of the cases will show how close a simulation is tolerated and how cautious the courts are in interfering with that free competition in journalism, so necessary to the maintenance of free institutions.

In the case of *Snowden v. Noah*, 1 Hop. 347, the defendant, Noah, was the editor, but not the proprietor of the newspaper establishment called the National Advocate; and immediately after the sale of that establishment by its former proprietor to the plaintiffs, Noah established another newspaper under the title of the New York National Advocate. The new gazette thus established was sent to the subscribers of the former national Advocate; and Noah solicited and continued to solicit the support of the patrons of the former paper and the public to his new paper. These were the facts of the case, and the judge in delivering his opinion remarked, "The only circumstance in this case which has any appearance of an undue encroachment upon the rights of Snowden is, that Noah's new paper is published under a name nearly the same with that of Snowden." The injunction was refused.

In the case of *Bell v. Clarke*, 8 Paige Chy. Rep. p. 74, the title of the plaintiff's paper was the "Democratic Republican, New Era," and that of the defendant's paper was "The New Era, revived by Richard Adams Locke, its former editor." The defendant's paper was the revival of an old paper in which he was formerly interested with the plaintiffs, but had been discontinued more than eighteen months. The defendant denied all intention by the use of the title "New Era," of inducing the public to believe that it was the plaintiff's paper. The court held that the plaintiffs had so abandoned their old title as to authorize the defendant or any one else to adopt it; and that the defendant's paper was not such a simulation of the plaintiffs' present publication as to injure the

circulation and patronage of the latter, by deceiving the public, and inducing the belief that it is, in reality, the same paper. The injunction was refused.

The same principle was recognized in the recent case of *Spottswood v. Clarke*, 2 Phil. 22 Eng. Chy. Rep. p. 154. The contest in this case grew out of the publication of two rival "Pictorial Almanacks." The title of the plaintiff's work was:

The Pictorial Almanack
For 1847.

Greenwich        Price 6d.
Astronomical       Royal
           Calendar

And
Year Book
For
The Gardener, Farmer, Naturalist, and Man of
Business

The title of the defendant's work was:

Old Moore's Family
Pictorial Almanack
For 1847.

Greenwich Royal       The Man of Business,
Astronomical Calendar     The Housewife,
And Year Book for the    A Faithful Companion
Gardener, Farmer,        For all Times and
Sportsman, Naturalist,       Seasons.

The defendant's publication was smaller than the plaintiffs', and the wrapper was colored yellow, while the plaintiffs' was white.

The Chancellor held that, while there was a simulation of title, yet they were sufficiently distinct not to

deceive the public, and not being satisfied with the plaintiffs' legal right, refused the injunction.

These cases clearly show that the mere simulation of title, however, close, will not warrant the courts in arresting the publication by injunction.

Suppose, however, that the defendants had not simulated the plaintiffs' title, but had adopted it literally, and done nothing more, publishing under that title a new work as their own, on the same general branch of science, would it have justified the court in awarding an injunction? Is the mere usurpation of title sufficient to call for the interference of a court of equity? The doctrine that the title of a book or periodical is part of the work, capable of being infringed like the body of the publication, and that the infringement is to be redressed as a piracy, has not been expressly affirmed, either in this country or in England. The cases on this subject require something more than a mere usurpation of title. There must be some fraud or deception practiced. In the case of *Hogg v. Kirby*, 8 Vesey 215, the defendant adopted the same title for his publication that the plaintiffs were using, commencing his publication with the last word used in the preceding number of the plaintiffs' inserting an article on a subject promised by the plaintiffs, publishing an index to all the preceding numbers issued by the plaintiffs, and representing his work as the work of the plaintiffs. It was this fraud on the part of the defendant, in representing his work as the work of the plaintiff, which induced Lord Eldon to award the injunction. It was not the usurpation of the title, which alone called for the interposition of the court, but it was the act of deception in endeavoring to identify the defendants work with that of the plaintiffs' as being one and the same. The same principal was affirmed in the case of *Snowden v. Noah*, in which the Chancellor said "that the good will of an established trade, the custom of an inn, and the right of the publisher of books may be infringed by acts of piracy and deception; but the injury for which redress is given in such cases, results from the imposture practiced upon the customers of an existing establishment, or upon the public. When the friends of an existing newspaper are informed by a rival newspaper that the two papers are not the same, but are distinct establishments, there is no deception;

and the detriment which either establishment may suffer from the competition of the other, results from the free option of those who choose to give their support to one establishment in preference to the other. This employment is subject to all the incidents of a free competition; and when no deception is practiced, the award of the public, or those who patronize newspapers, must determine the patronage which each rival press shall receive.

These cases clearly show that the mere assumption of the plaintiffs' title by a rival, but distinct publication, however well established the plaintiffs' right to that title may be by uninterrupted usage and possession, will not warrant the court in awarding an injunction; but to the usurpation of the title must be superadded some act of fraud or deception, to call into exercise the preventive powers of a court of equity.

The inquiry then is, have the defendants been guilty of fraud? I cannot say that the facts disclosed by the evidence will sustain this imputation. In the editorial accompanying the advertisement published by the defendants in the Richmond Whig, the defendants represent their work as a new journal of which they are the editors and proprietors, and announce that all connection between Messrs. Ritchie & Dunnavant and themselves had ceased; and in the editorial published in their own journal, they speak of it as a "cousin-german of the pioneer journal of Virginia." In their answer, they emphatically deny all intention, by the simulation of their title to that o the plaintiffs' of misleading the public, and the plaintiffs in their bill speak of the defendants' publication as a rival journal, a rival publication. Nor do they charge that the defendants represented their journal as the journal of the plaintiffs, and thereby sought to impose it upon the patrons of the plaintiffs. The utmost to which the defendants have gone in this respect is, in representing that the plaintiffs had suppressed, abandoned, and discontinued their old journal. How far this statement is sustained by the fact that the plaintiffs had merged or combined their journal with another, it is not necessary for me to decide. It will be observed, however, that the plaintiffs do not charge the defendants with continuing this misrepresentation, or threatening to continue it. Even if they did, and the fact were so, it could not be

remedied by an injunction. But the plaintiffs speak of this misrepresentation as something already done. Now, the remedy by injunction, with a few rare exceptions, is a preventive remedy. It is resorted to prevent an apprehended injury, or to arrest a continuing one; but when the injury complained of is past and completed, the party has a complete remedy at law; and a court of equity will not interfere, but will leave the party to seek his redress by an action for damages. And such is the plaintiffs' redress in this case, if the defendants have published the alleged misrepresentation, and the plaintiffs have been thereby injured.

In the absence then of anything really calculated to deceive the intelligent patrons of the Virginia Medical Journal, the decision in the cases cited is authority against this application for an injunction to restrain the defendants from publishing the Monthly Stethoscope and Medical reporter.

The rule must be discharged.